*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1484**

State of Minnesota,
Respondent,

vs.

Jeremy Dean Zittel,
Appellant.

**Filed August 11, 2014
Affirmed
Rodenberg, Judge**

Dakota County District Court
File No. 19HA-CR-12-1155

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Stacy A. St. George, Assistant County Attorney, Hastings, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Stephanie A. Karri, Special Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Rodenberg, Presiding Judge; Johnson, Judge; and Chutich, Judge.

**U N P U B L I S H E D   O P I N I O N**

**RODENBERG**, Judge

On appeal from his conviction of second-degree assault with a dangerous weapon, appellant Jeremy Dean Zittel argues that (1) the prosecutor committed misconduct during

her cross-examination of appellant and (2) the district court abused its discretion in admitting inadmissible evidence. We affirm.

## FACTS

Appellant and K.D. are the parents of a now-six-year-old daughter, B.Z. By agreement, appellant had sole physical custody of B.Z. and he and K.D. shared legal custody of the child. On April 1, 2012, appellant and K.D. had a dispute concerning K.D. picking up B.Z. that evening. At the jury trial, K.D. testified that she arrived at appellant's house around 8:30 p.m. intending to pick up B.Z. but noticed that the lights were off. She knocked on the door, but there was no answer. She then walked to her vehicle to call appellant by cell phone and noticed B.Z. peeking through the blinds. K.D. asked B.Z., "Where is your dad?" and B.Z. responded, "Daddy is here, daddy is here." B.Z. then opened the door. K.D. entered the home and noticed appellant seated in a recliner. K.D. turned on the lights and said "hello." Appellant did not respond. K.D. testified that she was surprised by the messy condition of the residence "because that's where our daughter lives, and I felt that it was unacceptable for the home to look like that, knowing what I knew, what the home used to look like, and it is never like that."

Appellant then woke up, and K.D. testified that she asked him "'what has happened here, what the F has happened,' and he basically told me to 'get out'" of the house. K.D. left the house and waited for B.Z. in her vehicle. Appellant and B.Z. eventually stepped outside. Appellant handed K.D. a bag, which had a change of clothes for B.Z., and told B.Z. "to go back inside and put some shoes on." K.D. again confronted appellant regarding the condition of the home. Appellant told her that it was none of her

2

business and pulled a gun from behind his back. Appellant held the gun out in front of him "angled down" and "briefly pointed it at [her] for probably about five seconds" before angling it down again.

K.D. went back to her vehicle and called the police. Police officers arrested appellant and found B.Z. asleep in her bedroom. The officers also located and photographed appellant's loaded pistol on his dining room table.

In contrast, appellant testified that he and K.D. had originally agreed on K.D. picking up B.Z., but he changed his mind following "verbal altercations over the phone" and told K.D. not to come by the house. Appellant put B.Z. to bed around 8:00 p.m. and fell asleep in his recliner. He admitted that he had consumed "three or four shots or four or five drinks" before K.D. arrived. Appellant awoke to find K.D. in the entryway of his home. Feeling groggy, appellant asked K.D. what she was doing in his home. He testified that he told her to leave and argued with her both inside and outside the home. Appellant testified that B.Z. was asleep in bed the entire time. Appellant also testified that he kept his pistol unloaded and in a case on top of his refrigerator. He denied taking the gun out of the case and pointing it at K.D. He claimed to have "no idea" how the gun ended up on his dining room table, although he testified that K.D. was herself familiar with the gun, how to load it, and where it was kept.

The jury found appellant guilty of second-degree assault with a dangerous weapon in violation of Minn. Stat. § 609.222, subd. 1 (2010). This appeal followed.

3

# DECISION

## I.

Appellant argues that the prosecutor committed misconduct during appellant's cross-examination when she asked him whether he expected the jury to believe that either the police or K.D. had placed the handgun where the police found it. Appellant had testified on direct that K.D. knew that he kept his handgun on top of the refrigerator and that he had shown K.D. how to use the handgun, including how to "put a bullet in the chamber." And appellant stated that he had "no idea" how the handgun got onto his dining room table. The following exchange then occurred on cross-examination:

> Q: Now, [appellant], you are claiming or you stated that you didn't put the weapon on the table, correct?
> A: Correct.
> Q: Is it your testimony, then, that you believe that the police planted the weapon there?
>> [APPELLANT'S ATTORNEY]: Objection, argumentative, relevancy.
>> THE COURT: Please approach.
>> . . . .
>> THE COURT: You may proceed.
> [PROSECUTOR]: Thank you.
> Q: [Appellant], are you, then, claiming that the police planted the weapon on the table?
> A: No.
> Q: So, then, you want us to believe that the victim came into your house, found the weapon, loaded it, and put it on the table all while you were sleeping in the recliner, correct?
>> [APPELLANT'S ATTORNEY]: Objection, badgering, facts not in evidence.
>> THE COURT: Overruled.
> A: Yes.

In her closing argument, the prosecutor mentioned appellant's theory that K.D. placed the handgun on his dining room table, calling it a "pretty incredible story."

4

Appellant's attorney argued in closing that no one knew how long K.D. was in the home before appellant woke up and that it was possible K.D. loaded the handgun and placed it on the dining room table.

When a prosecutor's questions are objected to at trial, we consider "whether the district court abused its discretion in permitting the state to ask" the challenged questions. *State v. Morton*, 701 N.W.2d 225, 234 (Minn. 2005). We will reverse a guilty verdict only when the improper questions "impaired the defendant's right to a fair trial." *Id.* at 233.

The state argues that we should review the prosecutor's questions for prosecutorial error rather than prosecutorial misconduct. But the standard for reviewing prosecutorial misconduct is "equally applicable to prosecutorial error." *State v. Leutschaft*, 759 N.W.2d 414, 418 (Minn. App. 2009), *review denied* (Minn. Mar. 17, 2009). And, on careful review of the entire record, we conclude that the prosecutor here committed neither misconduct nor error.

Appellant testified that he did not put the handgun on his dining room table, and his testimony before the objected-to questions suggested that K.D. could have done so because she knew where he kept the handgun and she knew how to load it. The prosecutor fairly cross-examined appellant regarding his theory of the case, given appellant's direct testimony suggesting that K.D. might have placed the handgun where police found it. We do not agree with appellant's assertion that the prosecutor misstated the evidence during her questioning. *See State v. Mayhorn*, 720 N.W.2d 776, 788 (Minn. 2006) ("A prosecutor commits misconduct by intentionally misstating evidence."). And

5

the objected-to questions were not of the "were they lying" variety. The questions did not reference K.D. or her testimony or ask whether appellant thought that K.D. was lying. *See State v. Pilot*, 595 N.W.2d 511, 516 n.1 (Minn. 1999) (explaining that in an improper "were they lying" question, a prosecutor first asks the defendant if he heard the earlier testimony and if that testimony was accurate before then asking the defendant to comment on the witness's truthfulness); *see Morton*, 701 N.W.2d at 233, 235 (explaining that the prosecutor improperly asked whether earlier witnesses were not telling the truth).

We also do not agree that the prosecutor "improperly shifted the burden of proof" to appellant. Both the prosecutor and the district court properly explained to the jury that the state had the burden of proof. *See State v. McDonough*, 631 N.W.2d 373, 389 n.2 (Minn. 2001) ("[A] prosecutor's attempts to shift the burden of proof are often nonprejudicial and harmless where, as here, the district court clearly and thoroughly instructed the jury regarding the burden of proof."). The prosecutor was challenging appellant's version of events during cross-examination and in summation. *See State v. MacLennan*, 702 N.W.2d 219, 236 (Minn. 2005) (stating that the state "may specifically argue that there is no merit to the [defendant's] particular defense").

We see no abuse of the district court's discretion in its evidentiary rulings. *See Morton*, 701 N.W.2d at 234. But, even assuming an abuse of discretion, any error was harmless. *See id.* at 233 ("An error is harmless beyond a reasonable doubt only if the verdict rendered was surely unattributable to the error." (quotation omitted)). Appellant answered the prosecutor's question regarding K.D. in the affirmative. He wanted the jury to believe that K.D. loaded the handgun and placed it on the dining room table. That was

6

part of his theory of the case. Therefore, the jury's verdict was unattributable to the questions that appellant challenges on appeal.

**II.**

Appellant also argues that the district court abused its discretion in admitting 22 photographs of the inside of his home.[1] "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citations omitted). "The admission of photographs is a matter left to the discretion of the [district court]." *State v. Sullivan*, 502 N.W.2d 200, 202 (Minn. 1993). "Photographs are admissible if they accurately portray anything that a witness may describe in words, or the photographs are helpful as an aid to an oral description of objects and conditions, provided they are relevant to some material issue." *Morton*, 701 N.W.2d at 237. Photographs are not rendered inadmissible if they incidentally arouse the passion or prejudice of the jury. *Sullivan*, 502 N.W.2d at 202.

Appellant argues that the photographs of the inside of his house were not relevant to the charge of second-degree assault. We disagree. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Photographs of a scene can assist a jury "in determining

---

[1] The photographs depict the inside of the home including, as discussed below, two photographs of the handgun on the table. Several other photographs show a cluttered and dirty home.

7

the elements of the alleged crime." *State v. Dame*, 670 N.W.2d 261, 264 (Minn. 2003). Here, the photographs depicted the scene of the alleged crime. Two of the photographs also depicted the placement of the handgun on the dining room table. And the photographs provided some circumstantial evidence of the state of appellant's mental health and his possible intoxication. They also allowed the jury to consider the context of the disagreement between appellant and K.D. concerning the state of the house. The photographs of appellant's home were relevant and helpful to the jury. *See State v. Walen*, 563 N.W.2d 742, 748 (Minn. 1997) ("The appropriate test regarding the admissibility of photographs and other visual aids is relevance, in other words, whether the photographs and other visual aids are helpful to the jury.").

Appellant also argues that the photographs were improperly admitted because "the prejudicial effect of the photographs substantially outweighed their probative value." Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Minn. R. Evid. 403. "'[P]rejudice' does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Ferguson*, 581 N.W.2d 824, 834 (Minn. 1998).

Here, the record regarding the prejudicial effect of the photographs is imperfect because it does not establish whether the district court analyzed the prejudicial effect of each photograph individually. *See Dame*, 670 N.W.2d at 264 ("In determining the admissibility of photographs, the district court must consider the relevance of each

photograph and must also weigh the probative value of that photograph against its prejudicial effect."); *Sullivan*, 502 N.W.2d at 203 ("[T]he fact that the [district] court made individual determinations as to the appropriateness of the photos is sufficient to show a proper exercise of discretion, and that the [district] court balanced their probative value against their potential for creating unfair prejudice.").

We conclude that the district court did not abuse its discretion in admitting the photographs into evidence as not unfairly prejudicial to appellant. Appellant was charged with second-degree assault with a dangerous weapon for allegedly pointing a firearm at his ex-girlfriend. In providing photographic evidence of the context of the argument between appellant and K.D., the photographs may have reflected poorly on appellant's housekeeping. But the record contains no suggestion that the photographs (some of which were unobjected to) were unfairly prejudicial. Although the district court might have sustained appellant's objection to the volume of photographs, we see no abuse of the district court's discretion.

Moreover, even if the district court abused its discretion in admitting the challenged photographs, which we conclude that it did not, introduction of the photographs was harmless. *See Amos*, 658 N.W.2d at 203. Nothing in the record suggests that the jury confused appellant's housekeeping with the charged assault on K.D. As noted, appellant raised no objection to several of the photographs showing the home's disorder. The jury did not reach its verdict based on the challenged photographs. *See State v. Post*, 512 N.W.2d 99, 102 n.2 (Minn. 1994) ("[I]f there is a reasonable possibility that the verdict might have been more favorable to the defendant if the

evidence had not been admitted, then the error in admitting the evidence was prejudicial error."). Any error in admitting the additional photographs of the home as to which appellant's objections were overruled was undoubtedly harmless.

**Affirmed.**